UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

NOLAN WHITAKER                                                                                    PLAINTIFF

v.                                                                          CIVIL ACTION NO. 3:05CV-473-S

ELECTRONIC DATA SYSTEMS CORP, et al.                                              DEFENDANTS

### MEMORANDUM OPINION

This matter is before the court upon the motion of the defendants, Electronic Data Systems Corporation ("EDS") and Mark Thompson ("Thompson"), collectively "Defendants", for summary judgment. A party moving for summary judgment has the burden of showing that there are no genuine issues of fact and that the movant is entitled to summary judgment as a matter of law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153-61, S. Ct. 1598, 1606-10, 16 L.Ed.2d 142 (1970); *Felix v. Young*, 536 F.2d 1126, 1134 (6th Cir. 1976). Not every factual dispute between the parties will prevent summary judgment. The disputed facts must be material. They must be facts which, under the substantive law governing the issue, might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The dispute must also be genuine. The facts must be such that if they were proven at trial, a reasonable jury could return a verdict for the non-moving party. *Id.* at 2510. The disputed issue does not have to be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial. *First Nat'l Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288-89, 88 S.Ct. 1575, 1592-93, 20 L.Ed.2d 569 (1968). The evidence must be construed in a light most favorable to the party opposing the motion. *Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425 (6th Cir. 1962).

For the reasons set forth below, we will grant Defendants' motion.

## BACKGROUND

The plaintiff, Nolan Whitaker ("Whitaker"), was employed by EDS as a software engineer for EDS' U.S. Army account in Fort Knox, Kentucky, from 1996 until his termination in 2003. At all times, Whitaker's management chain included Thompson, who reported to Billie Giles, the Account Manager. Defendants claim that Whitaker performed his job well until 2000, when in his performance review his supervisor at that time, Jim Puckett ("Puckett"), noted that while Whitaker had excellent technical skills, "sometimes it didn't appear that work was Whitaker's priority as he had many other things going on."

In 2001, Whitaker moved off Puckett's team and began working under the supervision of Robin Bennett ("Bennett"), who reported to Thompson. Prior to moving to Bennett's team, Whitaker requested that he be allowed to work remotely from Lexington, Kentucky, while he pursued a Masters Degree at the University of Kentucky. EDS agreed to allow Whitaker to work while he pursued this degree and also agreed to pay his tuition. EDS, however, informed Whitaker that he would still be expected to work a full forty (40) hour work week and to remain in constant communication with his supervisor.

Like Puckett, Bennett soon developed concerns regarding Whitaker's performance, including absences and missed deadlines. Bennett believed Whitaker was taking advantage of his remote location. In her year end review of Whitaker, Bennett noted that he "has not demonstrated commitment to the project or ownership of his assigned responsibility," which "resulted in late deliverables and tasks being re-assigned to other team members." Bennett also stated that Whitaker "had difficulty in the last year adjusting to working remotely resulting in less that optimal performance."

Because of these issues, Whitaker's privilege of working remotely was revoked at the end of December 2001. Whitaker returned to work at Fort Knox in January 2002. In mid-October 2002, Thompson assigned Whitaker the task of maintaining the "ITASS" system, a computer system used

by the Army to approve information-technology related acquisitions. While on ITASS, Whitaker reported directly to Thompson, who experienced the same attendance issues with Whitaker as did his previous supervisors. Whitaker missed five (5) days in October 2002 and six (6) days in November, which led Thompson to counsel him on November 26, 2002.

Whitaker told Thompson that his absences were due to isolated illnesses and that these absences would not recur. Whitaker's absences, however, continued and in December 2002 began drawing complaints from EDS customers. After another absence in January 2003 and several days of being late for work, Thompson warned Whitaker about his tardiness. However, two days after being warned, Whitaker missed work again. At this point, Thompson asked Giles, the Account Manager, to get involved. Giles met with Whitaker regarding his attendance issues and warned him that he was in danger of being terminated. Giles also told Whitaker that if he was having personal issues he could call EDS' Employee Assistance Program ("EAP"), which provides counselors and other forms of assistance to employees.

Whitaker's absences and tardiness continued in February, in which he missed several days of work and left early or arrived late on three (3) separate occasions. Whitaker assured Thompson that he was "getting [him]self a bit more organized so that there are few things that can hold [him] up in the morning." Yet, despite these assurances, Whitaker's attendance issues continued into March, and on March 20, 2003, Giles again warned Whitaker that he must improve his attendance.

The next day, March 21, 2003, Giles received an email from Whitaker. In the email Whitaker explained that he was having personal issues and needed to take time off for counseling. Whitaker stated that he believed his leave would qualify under the Family Medical Leave Act (FMLA). On March 24, 2003, Giles received a handwritten note from Whitaker, in which Whitaker stated that his doctor was recommending he take some time off work for depression. Giles contacted EDS' disability coordinator, Synchrony Integrated Disability Services, regarding Whitaker's request for

leave. Synchrony approved short term disability and FMLA leave for Whitaker, from March 18, 2003 through April 15, 2003, with the option of extension upon medical documentation.

Whitaker went on leave. But, on April 11, 2003, in an email to Thompson, Whitaker stated that he would like to return to work as soon as possible. Thompson responded that Whitaker should seek approval to return from Synchrony. Whitaker was eventually released to return to work, without medical restrictions, on May 7, 2003. However, in late May 2003, Whitaker's attendance problems resurfaced. Whitaker was late twice in May and twice at the beginning of June.

These absences prompted Thompson to speak to Kris West ("West"), an EDS Human Resources ("HR") representative. West suggested that Thompson place Whitaker on an Attendance Improvement Plan ("AIP"), which Thompson and Giles delivered to Whitaker on June 5, 2003. The AIP provided that Whitaker could only have two (2) excused absences, which specifically excluded any FMLA qualifying absences or other protected leave over the next ninety (90) days. Otherwise, Whitaker would face termination. The AIP provided that if Whitaker was unable to come to work, or was going to be tardy, he was to contact Thompson via telephone, by 8:30 a.m,. on the morning of the pending absence.

On June 16, 2003, Whitaker emailed Thompson at 8:33 a.m., indicating that he would be absent from work to run errands related to a car accident. Thompson reminded Whitaker about the terms of the AIP, but ultimately decided that even though Whitaker failed to comply with those terms, he would not count this absence as one of Whitaker's two excused absences. Nonetheless, Thompson reiterated that henceforth, in order for an absence to be excused, Whitaker had to call, discuss the absence with him, and receive his approval. However, on June 18, 2003, Whitaker left work at 3:00 p.m. because he was allegedly ill. Because Whitaker failed to provide a supporting doctor's note, Thompson elected to count this toward Whitaker's allotted absences.

On July 2, 2003, Whitaker left a voice mail message for Thompson saying that he was ill and trying to schedule a doctor's appointment. On advice from West, Thompson informed Whitaker

- 4 -

upon his return to work on July 3, 2003, that his July 2nd absence would be his second of the two allowed absences and that the next absence, tardy, or early departure could lead to separation. This was confirmed in an email Thompson sent to Whitaker on July 9, 2003. On July 24, 2003, Whitaker notified Thompson that he would be returning late from lunch because he had to obtain a cash refund on his deposit from an extended-stay hotel in which he had been living. Thompson did not count this time away from work against Whitaker.

However, Plaintiff's problems at EDS went beyond attendance. They included misuse of his corporate credit card and substance abuse. In late January 2003, EDS learned that Whitaker had used his corporate credit card for personal purchases and was delinquent in paying his bill. EDS policy is that corporate cards are for business use only. Literature regarding this policy is sent to all employees who receive a card. This literature also warns employees that personal use of the card is grounds for termination. Thompson spoke to Whitaker about his personal charges, and Whitaker assured Thompson he would stop the personal use. But, just two days after this conversation, Whitaker again charged personal expenses to his corporate card. During the same conversation Giles had with Whitaker on March 20, 2003, regarding his attendance, Giles also discussed Whitaker's abuse of the corporate card and warned him that if he did not pay his bill by the end of the month, he would be terminated.

Whitaker also abused drugs while employed at EDS. At some point in late 2001, Whitaker began purchasing and using methamphetamines ("meth") and Ecstasy, which Whitaker claims he only used on "off hours" or weekends until his termination from EDS. Whitaker admits he was addicted to meth but denies any addiction to Ecstasy. Whitaker never informed management at EDS that he was using illegal drugs and management was unaware of this activity. EDS' Code of Conduct, which Whitaker admits he read and understood, includes a prohibition against drug use. In addition, Whitaker required a certain level of security clearance to perform work for the Army.

Had his drug use been known, Whitaker's security clearance would have been subject to revocation for use of illegal substances.

On August 5, 2003, Whitaker called Thompson at 8:55 a.m. and said that because his alarm had failed to wake him he would be late. Thompson discussed the situation with West, and based upon Whitaker's continued attendance problems and failure to comply with the AIP, Thompson, Giles, and West made the decision to terminate Whitaker's employment.

Whitaker now brings this suit claiming that Defendants (1) retaliated against him for making FMLA claims and (2) denied him his or interfered with his FMLA rights. The FMLA provides a qualifying employee up to twelve (12) weeks per year of unpaid leave when the employee suffers from a "serious health condition" that renders him unable to perform the functions of his position. *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005). He also claims he is disabled due to drug addiction and depression, and as such, Defendants' actions violate the Kentucky Civil Rights Act ("KCRA").

## ANALYSIS

### I. FMLA Retaliation

FMLA retaliation claims are analyzed under burden shifting approach first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006). Under this approach, the plaintiff must establish his *prima facie* case of FMLA retaliation by showing that: (1) he availed himself of a protected right under the FMLA; (2) he suffered an adverse employment action; and (3) a causal connection exists between the exercise of his rights under the FMLA and the adverse employment action. *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 314 (6th Cir. 2001) (citing *Canitia v. Yellow Freight Sys., Inc.*, 903 F.2d 1064, 1066 (6th Cir. 1990)). If the plaintiff satisfies these requirements, then the burden shifts to the defendant to provide a legitimate, non-discriminatory reason for its alleged adverse action. *Id.* at 315. Once this reason is offered, the burden shifts back

to the plaintiff to show that the defendant's purported reason is merely a pretext for unlawful retaliation. Pretext, however, can only be demonstrated by establishing "(1) that the proffered reasons had no basis *in fact*, (2) that the proffered reasons did not *actually* motivate discharge, or (3) that the proffered reasons were *insufficient* to motivate discharge." *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (citations omitted).

There is no dispute that Whitaker availed himself of a protected right under the FMLA when he asked to take leave for depression. There is also no dispute that Whitaker suffered an adverse action in that he was terminated.[1] Whitaker, however, is unable to establish a causal connection between his termination and his exercise of rights under the FMLA. More than temporal proximity is needed, particularly when Defendants provide compelling alternate causal explanations for the adverse action, such as its legitimate, nondiscriminatory reason of Whitaker's attendance problems and failure to adhere to the AIP. *Steiner v. Henderson*, 121 Fed. Appx. 622, 626-27 (6th Cir. 2005) ("Numerous Sixth Circuit cases have noted that temporal proximity alone is often insufficient to prove the causal prong of the *prima facie* case." *Id.* at 626). Thus, even if Whitaker could demonstrate a causal connection, Defendants give a legitimate, nondiscriminatory reason for terminating Whitaker.

On the other hand, Whitaker is unable to counter with any evidence that this reason is merely a pretext for Defendants to retaliate. His contention that other employees who missed work, arrived late, or left early were not sanctioned or terminated is merely a conclusory allegation. The employees cited in Whitaker's Response as comparators were not similarly situated to him and are

---

[1] Whitaker also alleges that certain work disruptions (i.e., people interfering with his work by moving his computer cursor) and the June 5, 2003 AIP are adverse actions. However, adverse actions must be *materially* adverse. *Burlington N. & Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405, 2415, 165 L.Ed.2d 345 (2006). Materially adverse actions are generally only indicated when there is a termination, a demotion accompanied by a decrease in salary, a less-distinguished title, a loss of benefits or pay, reassignment to menial or degrading work, harassment by the employer calculated to encourage the employee's resignation, or a significant decrease in material responsibilities. *Kocsis v. Multi-Care Mgmt.*, 97 F.3d 876, 885-86 (6th Cir. 1996). Neither the alleged work disruptions nor the AIP meet this standard.

thus inadequate comparators.[2] Defendants are entitled to summary judgment on Whitaker's FMLA retaliation claim.

## II. FMLA Entitlement and Interference

The FMLA permits a plaintiff to recover for denial of his of substantive rights under the "entitlement" or "interference" theory. This theory arises from 29 U.S.C. § 2614(a)(1), which provides that "any eligible employee who takes leave . . . shall be entitled, on return from such leave (A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or (B) to be restored to an equivalent position[]", and§ 2615(a)(1), which states that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided in this subchapter." *Id.*

Whitaker claims that when Defendants terminated his employment, they denied him his right to reinstatement. Yet, the right to reinstatement is not absolute. *Arban v. West Pub. Corp.*, 345 F.3d 390, 401 (6th Cir. 2003). The plaintiff must first establish that he is entitled to the benefit he claims. *Id.* But, if the defendant "'claims that the employee would have been discharged . . . the employee, in order to establish the entitlement protected by § 2614(a)(1), must, in the course of establishing the right, convince the trier of fact that the contrary evidence submitted by the employer is insufficient and that the employee would not have been discharged . . . if he had not taken FMLA leave.'" *Id.* (quoting *Rice v. Sunrise Express*, 209 F.3d 1008, 1018 (7th Cir. 2000)).

Here, Defendants assert that their decision to terminate Whitaker was made independent of and months after Whitaker's return from FMLA leave. However, Whitaker counters that the timing

---

[2]The employees cited in Whitaker's Response as having missed work are Wesley Reisz, Mary Patterson, Tom Carpenter, Katherine White, and Chad Green. These employees, however, are not similar to Whitaker because they took different types of leave, had a different number of unscheduled absences, had different prior work records, or had different supervisors making relevant determinations. *See Back v. U.S. Postal Serv.*, 210 F.3d 371 (6th Cir. 2000). Perhaps more importantly, these employees were not subject to the terms of the AIP. To be similarly situated Whitaker must establish that all relevant aspects of his employment situation were nearly identical to those with whom he desires to draw a comparison. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998).

of EDS' decision to terminate him "'could lead a fact finder to infer that . . . [he] would not have been fired, absent . . . [his] taking of leave.'" *Id*. at 401 (quoting *Kohls v. Beverly Enters. Wisc., Inc.*, 259 F.3d 799, 806 (7th Cir. 2001)). We disagree. Defendants terminated Whitaker three (3) months after he returned from FMLA leave, and Whitaker provides no other evidence that would permit a jury to infer that he would not have been fired had he not taken FMLA leave. *See and cf. Arban*, 345 F.3d at 401-02 (explaining that because the plaintiff cast doubt upon both the timing of and the reasons for the decision to terminate him, the jury was able to infer that the plaintiff was denied his substantive right to reinstatement). On the other hand, Defendants present considerable evidence that Whitaker's termination was based on his poor attendance and failure to meet the terms of the AIP. Whitaker's FMLA entitlement claim cannot withstand summary judgment.

Whitaker also claims Defendants interfered his substantive right to take FMLA leave. To prevail on a FMLA interference claim, a plaintiff must establish that (1) he was an eligible employee; (2) the defendant was an employer as defined under the FMLA; (3) he was entitled to leave under the FMLA; (4) he gave the defendant notice of his intention to take leave; and (5) the defendant denied him FMLA benefits to which he was entitled. *Edgar*, 443 F.3d at 507-08. However, interference with an employee's FMLA rights will not constitute a violation when the employer has a legitimate justification, unrelated to the exercise of FMLA rights, for denying him FMLA benefits. *Id.* at 508.

Factors (1)-(4) are undisputed. With regard to factor (5), Whitaker argues that while on FMLA leave he received phone calls from Thompson and Giles telling him he had to return to work; he cites *Arban* as supporting his contention that these phones calls effectively interfered with his FMLA benefits. In *Arban,* the Sixth Circuit noted that under 29 C.F.R. § 825.220(b), "'interfering with' the exercise of an employee's right under the FMLA includes 'discouraging an employee from using [FMLA] leave.'" *Arban*, 345 F.3d at 402 (quoting 29 C.F.R. § 825.220(b)).

Merely asking someone to return to work, however, does not amount to discouragement from taking leave. In order for Defendants to have discouraged Whitaker from taking FMLA leave, they must have provided a "power disincentive for taking FMLA leave." *Coleman v. Blue Cross Blue Shield of Kan.*, No. 05-4149-JAR, 2007 WL 1455927, *13 (D. Kan. May 16, 2007) (citing *Mardis v. Cent. Nat'l Bank & Trust of Enid*, 173 F.3d 864, 1999 WL 218903, at *2 (10th Cir. Apr.15, 1999)). Such was the situation in *Arban,* where the plaintiff while on FMLA leave received multiple phone calls from his employer asking the plaintiff to continue performing work related tasks. Upon the plaintiff's refusal, his employer said he would be fired. Such is not the situation here. Whitaker does not claim Defendants offered any type of consequence for his refusal to return to work. In fact, Defendant does not even claim he refused to return work and actually admits that while on FMLA leave, he *requested* a return to work as soon as possible. It was Defendants who insisted that Whitaker first obtain approval from its disability coordinator before returning to work. Whitaker ultimately took more FMLA leave than which he was originally approved, returning to work on May 7, 2003, almost a month after he asked to return to work. In short, Whitaker was denied nothing.

Whitaker's claim based on FMLA interference fails upon summary judgment.

### III. Disability Discrimination

To establish a *prima facie* case of disability discrimination under Ky. Rev. Stat. Ch. 344, a plaintiff show that: (1) he has a disability; (2) he was otherwise qualified for his position, with or without reasonable accommodation; and (3) the employer subjected him to discriminatory treatment solely by reason of his disability. *Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173, 1178 (6th Cir. 1996). Under the Kentucky Civil Rights Act, a person is disabled who (1) has a physical or mental impairment that substantially limits one of more major life activities, (2) has a record of such an impairment, or (3) is regarded as having such an impairment. Ky. Rev. Stat § 344.010.

If the plaintiff establishes his *prima facie* case, then the burden shifts to the defendant-employer to articulate a legitimate, non-discriminatory reason for its adverse action. *Maddox v.*

*University of Tenn.*, 62 F.3d 843, 846 (6th Cir. 1995). Once it offers such a reason, the burden shifts back to the plaintiff to provide evidence that the reason is actually a pretext for the employer's discrimination. *Id.*

Whitaker asserts that his drug addiction is a disability under the KCRA.[3] He is wrong. The KCRA's definition of disability excludes the use of illegal drugs and states that a disability shall not include an employee currently engaging in the illegal use of drugs. Whitaker also asserts that he was disabled due to his depression. Defendants argue that although Whitaker was diagnosed with having depression, it did not limit substantially limit one or more of his major life activities.

"[I]t is insufficient for individuals attempting to prove disability status . . . to merely submit evidence of a medical diagnosis of an impairment," *Toyota Motor Mfg., Co., v. Williams*, 534 U.S. 184, 197, 122 S.Ct. 681, 691, 151 L.Ed.2d 615 (2002). The plaintiff must show that his impairment must "substantially limits" one or more "major life activities." The EEOC defines "substantially limits" as being unable to perform or "significantly restricted as to the condition, manner or duration under which an individual can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity"; meanwhile, it defines "major life activities" as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working," and defined "substantially limits" as being unable to perform or "significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R §§ 1630.2.(i), (j)(1)(i).

---

[3]Whitaker's Complaint only charges EDS with a disability violation under the KCRA. While he has filed a motion to amend his Complaint in order to assert a claim under the Americans With Disabilities Act (ADA), the court's granting of that motion would be futile given that Whitaker has not timely filed a charge a discrimination, an administrative prerequisite for bringing an ADA claim in federal court. Thus, his Motion to Amend will be denied.

Whitaker submits that his depression led to serious financial problems, inability to sleep regularly, paranoia, and physical side effects (e.g., nausea), and that as such he was unable to work. However, Whitaker fails to establish that these symptoms substantially limited one or more major life activities, namely his ability to work. In fact, the depositions of his mental health providers, Drs. Willis and Butler, indicate Whitaker as having only "moderate" to "mild" difficulty in social and occupational functioning. When asked whether Whitaker's depressive symptoms were impairing him in any way, Dr. Willis testified: "No. I did not get the idea that is was the depressive symptoms as much as the substance abuse." This was confirmed by Dr. Butler who believed Whitaker's depressive symptoms were "most likely" related to his substance abuse. Moreover, according to Dr. Willis, Whitaker's symptoms improved when he abstained from substance abuse. Whitaker provides nothing more than his conclusory assertions regarding the extent of his impairment while acknowledging in his own deposition that he was generally able to work, care for himself, and perform major life activities.[4]

Whitaker is also unable to provide a record of a qualifying disability, even though he argues that because Defendants placed him on FMLA disability leave, he has such a record. He cites *Knight v. Metropolitan Gov't of Nashville*, 136 Fed. Appx. 755 (6th Cir. 2005) in support of his position; however, *Knight* requires "a record of a disability that *substantially limited . . . [a] major life activity* . . . ." *Id.* at 760 (emphasis added). "An individual has a record of an impairment if he has 'a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities.'" *Id.* (quoting 28 C.F.R. § 35.104). Again, Whitaker fails to demonstrate that his depression or the symptoms thereof substantially limited a major life activity.

---

[4] Whitaker also cites the testimony of Dr. Jane Osborne to support the existence of a qualifying disability. However, as Defendants argue in their Reply, Dr. Osborne's testimony is ultimately irrelevant given that she saw, treated, and evaluated Whitaker nearly two(2) years after his termination. It is established that a plaintiff must establish that he was a "qualified individual with a disability" *at the time* of the alleged discriminatory act. *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 884 (6th Cir. 1996). Dr. Osborne's testimony is expressly limited to Whitaker's condition in 2005. She indicates that she cannot diagnose what condition he had in 2003.

In addition, Defendants did not regard Whitaker as disabled. The Supreme Court has declared that there are two ways in which an individual may be "regard as" disabled: "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." *Sutton v. United Airlines, Inc.*, 527 U.S. 471, 489, 119 S.Ct. 2139, 2149, 144 L.Ed.2d 450 (1999). In other words, "it is necessary that a covered entity entertain misperceptions about the individual-- it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting." *Knight*, 136 Fed. Appx. at 760 (citing *Sutton*, 527 U.S. at 489). But, as Defendants assert, there is simply no evidence that they had these misperceptions. Moreover, it is inconsistent for Whitaker to argue in one breath that he is disabled and that Defendants had a record of his disability, while in another breath contend that Defendants were mistaken as to the existence or severity of his disability.

Yet, even assuming that Whitaker is able to establish he was disabled under factor (1), he is still unable to establish factor (2), that he was otherwise qualified for his position. "An employee who cannot meet the attendance requirements of the job at issue cannot be considered a 'qualified' individual protected by the ADA." *Tyndall v. National Educ. Ctrs. Inc.*, 31 F.3d 209, 213 (4th Cir. 1994), *cited with approval in Gannt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1047 (6th Cir. 1998); *see also Brenneman v. Medcentral Health Sys.*, 366 F.3d 412, 418 (6th Cir. 2004) (finding plaintiff was "unqualified due to his inability to satisfy [the employer's] basic attendance requirements"), *cert. denied*, 543 U.S. 1146 (2005); *Wimbly v. Bolger*, 642 F.Supp. 481, 485 (W.D. Tenn. 1986), *aff'd* 831 F.2d 298 (6th Cir. 1987) ("It is elemental that one who does not come to work cannot perform ANY of his job functions, essential or otherwise."). Defendants set forth evidence establishing Whitaker's numerous absences.

- 14 -

Finally, Whitaker is unable to set forth factor (3), that Defendants subjected him to discriminatory treatment solely by reason of his disability. The Sixth Circuit has made clear that a plaintiff must "demonstrate that disability was the *sole* reason for the adverse employment action." *Hedrick v. Western Reserve Care Sys.*, 355 F.3d 444, 454 (6th Cir. 2004) (emphasis added). Whitaker provides no evidence to support this factor, while Defendants submit evidence of his absences and failure to adhere to the AIP.

Yet, even if Whitaker were able to establish a *prima facie* case of disability discrimination, EDS articulates a legitimate, nondiscriminatory reason for any alleged adverse employment action: Whitaker's poor attendance. In response, Whitaker cannot demonstrate that this reason was a pretext for unlawful discrimination. As explained above with regard to his FMLA retaliation claim, the allegations Whitaker makes for pretext are merely conclusory assertions that other employees received more favorable treatment. Conclusory assertions cannot withstand summary judgment.

A separate order will be entered this date in accordance with this opinion.